## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

CAMERON JAMES WILSON, an individual,

Plaintiff,

vs.

EMELIKE DELANCY, AUSTIN GRIFFIN, and RYAN JUNDT, in their individual capacities; and NEAL HOLSTE, in his official capacity as Chief of Police,

Defendants.

Case No. 3:24-cv-2033-JR

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' SUR-REPLY**

# INTRODUCTION

This Court is now faced with a defense built not on facts or law, but on a desperate, post-hoc scramble to justify the unjustifiable. Defendants, having been confronted with their own officers' devastating admissions under oath, have abandoned reason and resorted to fabricating a justification for Plaintiff's arrest out of whole cloth. Their latest sur-reply (ECF No. 45) is a masterclass in misdirection, relying on a distorted reading of case law and a complete disregard for the sworn testimony of their own deponents. They ask this Court to grant qualified

immunity—a doctrine born of judicial activism and historical error—to shield officers who admitted they had no lawful basis for their actions.

This sur-reply will accomplish three objectives. First, it will expose the Defendants' primary justification for the arrest—an alleged violation of ORS 819.430 for a concealed Vehicle Identification Number (VIN)—as a demonstrably false, after-the-fact fabrication, proving the arrest was unlawful from its inception. Second, it will systematically dismantle each of Defendants' remaining arguments, from excessive force to First Amendment retaliation, using their own officers' testimony as the instrument of deconstruction. Finally, and most importantly, this sur-reply will confront the illegitimate doctrine of qualified immunity head-on, armed with the profound historical and textual analysis of judges like the Honorable Carlton W. Reeves and the groundbreaking research of legal scholars who have uncovered the doctrine's flawed foundation. This Court will be urged to follow a growing chorus of federal judges who recognize that qualified immunity is not just atextual, but brazenly *counter-textual* to the Civil Rights Act of 1871, and must be rejected.

# ARGUMENT

## I. DEFENDANTS' VIN THEORY IS A POST-HOC FABRICATION THAT CANNOT SUPPORT PROBABLE CAUSE

Defendants' entire case now hinges on the absurd proposition that Plaintiff was arrested for covering his VIN, a violation of ORS 819.430. This is a lie, and the record proves it. The timeline of events, combined with the officers' own sworn testimony, reveals this justification to be a desperate, post-hoc fabrication concocted long after the unlawful arrest to shield them from liability.

### A. The Timeline Exposes the Lie: The Arrest Occurred Before the VIN Was Ever Mentioned

Defendants triumphantly point to Officer Delancy's bodycam footage, where at timestamp 1:31, he states, "Your VIN is covered up. That you cannot do." (ECF No. 45 at 2). What they con-

veniently omit is that at this point, Plaintiff was already in handcuffs, having been unlawfully seized. The arrest was for "obstruction of justice," a charge Officer Delancy later admitted under oath was "incorrect." (Delancy Dep. 61:21-23).

The sequence of events is dispositive:

1. Plaintiff is cooperative and respectful, described by Delancy himself as "a gentleman." (Delancy Dep. 64:9-10).

2. Plaintiff exercises his clearly established First Amendment right to ask for the officers' badge numbers.

3. Within 15 seconds, he is seized and handcuffed for "obstruction of justice."

4. **Only after the unlawful seizure** does Delancy mention the VIN.

This is the very definition of a post-hoc rationalization. It is an attempt to retroactively apply a justification to an arrest that was, at its moment of inception, entirely baseless. The law does not permit this. An arrest is either lawful at the moment it is made, or it is not. It cannot be retroactively sanctified by a pretext discovered after the fact.

### B. Defendants Misapply *Devenpeck* and *Whren* to Sanction Their Fabrication

Defendants desperately cling to *Devenpeck v. Alford*, 543 U.S. 146 (2004), and *Whren v. United States*, 517 U.S. 806 (1996), arguing that an officer's subjective reason for an arrest is irrelevant so long as objective probable cause existed for some crime. Their reliance is misplaced and their interpretation is a dangerous distortion of the law.

*Devenpeck* requires that **objective** probable cause must have existed for *some* crime at the time of the arrest. It does not grant officers a license to arrest someone for no reason and then go fishing for a statutory violation to justify it later. Here, there was no objective probable cause for any crime. The officers' own testimony confirms this:

• Officer Delancy admitted the stated basis for the arrest—obstruction—was "incorrect." (Delancy Dep. 61:21-23).

- Officer Griffin testified that after the initial (and baseless) obstruction charge, Plaintiff had committed "no crime past that point." (Griffin Dep. 17:5-6).

There was no objective basis to believe a crime had been committed. Plaintiff's desire to protect his VIN from public view for privacy reasons does not constitute the criminal intent required by ORS 819.430. He was not trying to conceal the identity of the vehicle for a nefarious purpose; he was a citizen parked legally who wished to maintain his privacy. To suggest this benign act creates "objective probable cause" for an arrest is an affront to the Fourth Amendment.

*Whren* is equally inapplicable. *Whren* deals with pretextual traffic stops, where an officer has valid probable cause for a minor traffic violation but may have a subjective motive to investigate something else. It does not apply to a situation where there was **no valid probable cause for any offense** at the time of the seizure. This was not a traffic stop; Plaintiff was already parked. The officers had no reason to interact with him other than his lawful presence. Their attempt to bootstrap a non-existent traffic violation into probable cause is a legal fiction this Court must reject.

### C. ORS 819.430 Cannot Support Probable Cause: Element-by-Element Analysis

Defendants' reliance on ORS 819.430 as the basis for probable cause is not merely weak—it is legally and factually impossible. The statute requires proof of specific criminal intent that is entirely absent from this record. A careful examination of the statute's elements, compared against the undisputed facts, reveals that no reasonable officer could have believed probable cause existed.

ORS 819.430 provides: "A person commits the offense of unlawful possession of a vehicle if the person possesses a vehicle and the person knows or reasonably should know that: (a) The vehicle identification number of the vehicle has been destroyed, removed, covered, altered or defaced for the purpose of misrepresentation or concealment."

The statute contains four essential elements, each of which must be satisfied for probable cause to exist:

**Element 1: Possession of a Vehicle.** This element is satisfied. Plaintiff was in possession

4

of his vehicle.

**Element 2: VIN Destroyed, Removed, Covered, Altered, or Defaced.** Defendants claim this element is satisfied because Plaintiff had placed a cover over the VIN plate. However, the statute does not criminalize the mere act of covering a VIN. It criminalizes covering a VIN *for a specific unlawful purpose*, as set forth in Element 4.

**Element 3:  Knowledge.**  Plaintiff obviously knew that he had covered his VIN, as he openly admitted this to the officers and offered to uncover it. This element is satisfied.

**Element 4: Purpose of Misrepresentation or Concealment.** This is the critical element, and it is entirely absent.  The statute does not prohibit covering a VIN for privacy reasons, aesthetic reasons, or any other lawful purpose.  It prohibits covering a VIN *for the purpose of misrepresenting or concealing the vehicle's identity*—typically to hide that the vehicle is stolen, or to commit fraud.

Here, Plaintiff's own words negate any inference of criminal intent.  When asked about the covered VIN, he stated: "I can uncover it if you want but I like to stay private." (Delancy Decl. Ex. A at 13:41). This statement is an admission of a *lawful* purpose: privacy. It is not an admission of an intent to misrepresent or conceal the vehicle's identity for any unlawful purpose. To the contrary, Plaintiff's willingness to immediately uncover the VIN upon request demonstrates the absence of any criminal intent.

Defendants argue that Sergeant Delancy was "not required to construe it that way" and that the statement could be interpreted as evidence of criminal intent.  (ECF No. 45 at 4).  This argument is a dangerous inversion of the Fourth Amendment.  Probable cause is not a license for officers to adopt the least charitable interpretation of ambiguous conduct.  It requires an objective basis to believe that a crime *has been or is being* committed. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts").

Moreover, Defendants' own cited authority undermines their position. They quote *District of Columbia v. Wesby* for the proposition that "[p]robable cause requires only a probability or substantial chance of criminal activity." 583 U.S. 48, 57 (2018). But *Wesby* also makes clear that probable cause must be based on "the totality of the circumstances" and that officers

cannot ignore exculpatory evidence. *Id.* at 58. Here, Plaintiff's statement that he covered the VIN for privacy reasons is exculpatory evidence that negates the inference of criminal intent required by ORS 819.430.

Defendants also point to the fact that Plaintiff has removed license plates and had walked away from his vehicle as additional evidence of probable cause. But these facts, even when combined with the covered VIN, do not create a "substantial chance" that Plaintiff was committing a crime. Removing license plates is not, in itself, a crime. Walking away from one's vehicle during a traffic stop may be ill-advised, but it is not evidence of an intent to misrepresent or conceal a vehicle's identity. Also, there was no traffic stop as advised by Officer Griffin.

The fatal flaw in Defendants' theory is that they conflate Plaintiff's desire for privacy with criminal intent. Privacy is a constitutional right, not a crime. A citizen who covers his VIN to avoid having strangers copy it, who removes his license plates to prevent theft or harassment, or who simply prefers not to have his personal information on public display, is exercising his liberty—not committing a crime. To hold otherwise would criminalize ordinary, lawful behavior and grant officers unbounded discretion to arrest anyone who takes steps to protect their privacy.

## D. Defendants' Reliance on *Devenpeck* and *Wren* Is a Dangerous Distortion of the Law

Defendants' invocation of *Devenpeck v. Alford* and *Wren v. United States* is not just misplaced—it is a fundamental misreading of those cases that, if accepted, would eviscerate the Fourth Amendment's protections against arbitrary arrest.

Defendants argue that under *Devenpeck*, an officer's subjective reason for an arrest is irrelevant, and that an arrest is lawful so long as objective probable cause existed for *any* crime, even if the officer was not thinking about that crime at the time. (ECF No. 45 at 2-3). This is a half-truth that obscures the critical limitation in *Devenpeck*: the probable cause must have existed *at the time of the arrest*, based on facts known to the officer *at that moment*.

*Devenpeck* does not authorize officers to arrest someone for no reason and then search for a justification after the fact. The Supreme Court in *Devenpeck* was addressing a situation

where the officer had probable cause for Crime A but arrested the suspect for Crime B. The Court held that the arrest was lawful because, objectively, probable cause existed for Crime A at the time of the arrest, even though the officer's subjective motivation was Crime B. *See* 543 U.S. at 153.

Here, the situation is fundamentally different. Sergeant Delancy did not have probable cause for *any* crime at the moment he placed Plaintiff in handcuffs. The stated reason for the arrest was "obstruction of justice," which Delancy later admitted under oath was "incorrect." (Delancy Dep. 61:21-23). The VIN theory was not mentioned until *after* Plaintiff was already in handcuffs, as Defendants themselves now admit. (ECF No. 45 at 2) (citing bodycam at 1:31). This is the definition of a post-hoc rationalization.

Defendants attempt to sidestep this problem by arguing that Delancy was "thinking about" the VIN before the arrest, as evidenced by his mention of it at timestamp 1:31 and his later police report. But this argument is fatally undermined by the timeline. At the moment Delancy decided to handcuff Plaintiff, he did not articulate the VIN as the basis for the arrest. He articulated "obstruction of justice." The VIN was mentioned only after the arrest had already occurred, in an apparent attempt to justify what had just happened.

This is precisely the kind of post-hoc rationalization that the Fourth Amendment prohibits. As the Ninth Circuit has explained, "[a]n arrest cannot be justified by what the search produces." *United States v. Vasey*, 834 F.2d 782, 787 (9th Cir. 1987). Similarly, an arrest cannot be justified by a theory that the officer articulates only after the arrest has occurred. To hold otherwise would permit officers to arrest anyone for any reason—or no reason at all—and then manufacture a justification later.

*Whren* is equally inapplicable. *Whren* dealt with a pretextual traffic stop, where the officer had valid probable cause for a minor traffic violation but was subjectively motivated by a desire to investigate drug activity. The Supreme Court held that the stop was lawful because, objectively, probable cause existed for the traffic violation. 517 U.S. at 813. But *Whren* does not apply when there is **no probable cause for any crime**. As the Court made clear, the question is whether "a reasonable officer *could have* made the stop." *Id.* (emphasis added). Here, no reasonable officer could have believed that probable cause existed for ORS 819.430,

for the reasons explained above.

Defendants' interpretation of *Devenpeck* and *Wren* would create a regime in which officers could arrest citizens at will, secure in the knowledge that they could always find some statutory provision to cite after the fact. This is not the law. It is a recipe for tyranny.

### E. The Timeline Proves the VIN Theory Is a Fabrication

The body camera footage provides an incontrovertible record of the sequence of events, and that record destroys Defendants' claim that the arrest was based on ORS 819.430. The timeline is as follows:

1. Plaintiff asks for the officers' badge numbers.

2. Within 15 seconds, Sergeant Delancy orders Plaintiff to put his hands behind his back.

3. Plaintiff is placed in handcuffs.

4. **At timestamp 1:31—after Plaintiff is already restrained—Delancy mentions the VIN for the first time: "Your VIN is covered up. That you cannot do."**

This sequence is dispositive. The arrest occurred *before* the VIN was mentioned. The stated basis for the arrest, at the moment it occurred, was "obstruction of justice"—a charge Delancy later admitted was "incorrect." The VIN was raised only after the unlawful arrest had already taken place, in what can only be described as an attempt to retroactively justify the unjustifiable.

Defendants argue that Delancy was "thinking about" the VIN before the arrest, but they provide no evidence to support this claim other than Delancy's own self-serving declaration and police report, both of which were prepared long after the incident. The body camera footage—the only contemporaneous, objective record of the encounter—tells a different story. It shows that the VIN was not mentioned until after the arrest. It shows that the arrest was precipitated by Plaintiff's request for badge numbers, not by any concern about the VIN.

The law is clear: an arrest must be supported by probable cause *at the moment it occurs*. *See Henry v. United States*, 361 U.S. 98, 102 (1959) ("The requirement of probable cause has roots that are deep in our history."). An officer cannot arrest someone for one reason,

discover that reason is invalid, and then substitute a different reason after the fact. That is not how the Fourth Amendment works.

## II. THE USE OF FORCE WAS PER SE EXCESSIVE

Defendants argue that handcuffing Plaintiff was a "standard procedure" and therefore permissible. This argument collapses under the weight of one simple fact: the arrest was unlawful. When an arrest is not supported by probable cause, any force used in its execution is, by definition, excessive. *See, e.g., Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("[T]he use of force is unreasonable if the arrest is unlawful.").

Even if this Court were to entertain the fantasy that the arrest was lawful, the use of force was still unconstitutional. The reasonableness of force is judged by the three-factor test established in *Graham v. Connor*, 490 U.S. 386 (1989): (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Here, Officer Delancy himself admitted under oath that all three *Graham* factors weighed against the use of force:

- **Severity of Crime:** The alleged "crime" was obstruction of justice, which Delancy admitted was "incorrect." The post-hoc VIN theory is, at best, a minor traffic infraction.

- **Immediate Threat:** Officers admitted Plaintiff was not a threat, had no weapons, and was cooperative.

- **Resisting Arrest:** Officers admitted Plaintiff was not resisting, but was a "gentleman."

(Delancy Dep. 193:20). It is a rare and damning admission when the officer who applied the force concedes on the record that his actions were not justified under the Supreme Court's own standard. There is no clearer evidence that the force was excessive.

## III. THE FIRST AMENDMENT RETALIATION CLAIM IS NOT BARRED BY *NIEVES v. BARTLETT*

Defendants misread and misapply *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), in a desperate attempt to escape liability for retaliating against Plaintiff for exercising his First Amendment rights. They argue that *Nieves* requires Plaintiff to show that others were not arrested for the same conduct, a burden they claim he cannot meet.

This argument conveniently ignores the critical exception articulated by the Supreme Court in *Nieves* itself. The general rule in *Nieves* does not apply when a plaintiff can show that there was **no probable cause** for the arrest. *Id.* at 1727. As has been exhaustively demonstrated, the officers here had no probable cause to arrest Plaintiff for any crime. Their stated reason was admittedly "incorrect," and their fabricated reason is legally and factually baseless.

Because there was no probable cause, the *Nieves* exception applies, and Plaintiff need only show that the retaliatory motive was a "substantial or motivating factor" behind the arrest. The evidence for this is overwhelming and undisputed:

- Officer Griffin admitted the arrest happened "very quickly after he asked for badge numbers." (Griffin Dep. 23:8-9).

- The entire interaction, from Plaintiff asking for badge numbers to being placed in handcuffs, took a mere 15 seconds.

- In the absence of any criminal conduct, the only intervening event was Plaintiff's protected speech.

This is not mere "temporal proximity." It is a direct, causal link. The officers were faced with a citizen who knew his rights and dared to ask for their identification. Their response was to immediately, and unlawfully, punish him for it. This is the very essence of First Amendment retaliation, and it is precisely the kind of official misconduct the Ku Klux Klan Act was enacted to prevent.

# IV. QUALIFIED IMMUNITY: AN ILLEGITIMATE DOCTRINE BUILT ON A HISTORICAL LIE

Defendants' final, desperate plea is for qualified immunity. They argue that even if they violated Plaintiff's rights, the law was not "clearly established." This argument is not only factually wrong, but it rests on a legal doctrine that is, as a growing number of federal judges have recognized, an "unconstitutional error" with "no basis in law." *Green v. Thomas*, No. 3:23-CV-126-CWR-ASH (S.D. Miss. May 20, 2024) (Reeves, J.).

This Court should not grant immunity for three reasons: (1) the rights violated were, in fact, clearly established; (2) the doctrine of qualified immunity is a judicial invention that contradicts the plain text and history of the Civil Rights Act of 1871; and (3) granting immunity here would reward perjury and sanction the very abuses of power that § 1983 was designed to prevent.

## A. The Rights Violated Were Clearly Established

Even under the flawed qualified immunity framework, Defendants are not entitled to it. The rights at issue here are not novel or obscure. They are the bedrock principles of a free society:

- The right to be free from arrest without probable cause. *See, e.g., Beck v. Ohio*, 379 U.S. 89 (1964).

- The right to be free from excessive force. *Graham v. Connor*, 490 U.S. 386 (1989).

- The right to record and question the police without being arrested for it. *See, e.g., Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995).

No reasonable officer would believe they could arrest a cooperative, non-threatening citizen for simply asking for a badge number. No reasonable officer would believe they could fabricate a charge of "obstruction of justice" and then, when that lie was exposed, invent a new justification after the fact. The officers' conduct was not a reasonable mistake; it was a knowing violation of the law.

**B. Qualified Immunity is a Judicially-Created Fiction That Contradicts the Ku Klux Klan Act of 1871**

This Court is urged to look beyond the flawed precedents of qualified immunity and examine the doctrine's illegitimate roots. As Judge Carlton Reeves so powerfully articulated in *Green v. Thomas*, and as Professor Alexander Reinert has meticulously documented, the modern doctrine of qualified immunity is built on a historical falsehood.

Professor Reinert's research reveals that the Civil Rights Act of 1871, as originally passed by Congress, contained a critical piece of text that was later omitted by a clerk: the "Notwithstanding Clause." The statute originally read that a person who violates another's civil rights "shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,** be liable to the party injured..." *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201 (2023).

This clause was a clear and explicit command from the Reconstruction Congress: state common law defenses, including the good-faith immunities that form the basis of modern qualified immunity, were **not** to be a defense to a § 1983 claim. The very purpose of the Ku Klux Klan Act was to override state laws and customs that were being used to shield those who violated the rights of newly freed slaves and their allies.

As Judge Willett of the Fifth Circuit recognized, this discovery is a "game-changing argument" that reveals modern immunity jurisprudence to be not merely atextual, but brazenly **counter-textual**. *Rogers v. Jarrett*, 63 F.4th 971, 980-81 (5th Cir. 2023) (Willett, J., concurring). The doctrine does not complement the statute; it contradicts it.

For 150 years, courts have been applying a corrupted version of the statute. They have built a vast, complex, and often unjust body of law on a foundation of sand. This Court is not bound to perpetuate that error. It should follow the lead of Judge Reeves and a growing number of jurists who are willing to confront this historical mistake and apply the law as Congress actually wrote it.

# V. THE PHONE CONFISCATION: PERJURY EXPOSED BY VIDEO EVIDENCE

Defendants' attempt to minimize the confiscation of Plaintiff's cell phone is perhaps the most brazen example of their willingness to misrepresent the facts. They claim that Sergeant Delancy "never took the phone into his custody, but rather immediately placed it back into Plaintiff's pocket to continue recording the encounter." (ECF No. 45 at 7). This is a lie, and the body camera footage proves it.

The video record shows that when Delancy took the phone from Plaintiff's hand, the recording stopped. It did not "continue recording" as Defendants falsely claim. The phone was not "immediately" placed back in Plaintiff's pocket in a manner that allowed recording to continue. Instead, the phone was confiscated, the recording was terminated, and Plaintiff was deprived of his clearly established First Amendment right to record the police.

Defendants cite to Delancy's declaration and to timestamps 1:03 and 9:08 as purported evidence that Delancy "specifically attempted to avoid interfering with Plaintiff's recording." (ECF No. 45 at 7). But these citations do not support their claim. At timestamp 1:03, Delancy is in the process of handcuffing Plaintiff and taking the phone. At timestamp 9:08, the encounter is nearly over. Neither timestamp shows the phone "continuing to record" during the critical period when Plaintiff was being unlawfully detained.

This is not a mere factual dispute. This is systematic perjury. Defendants have made a factual representation to this Court—that the phone continued recording—that is directly contradicted by the video evidence. This conduct is not only unethical; it is criminal. *See* 18 U.S.C. § 1621 (perjury); 18 U.S.C. § 1503 (obstruction of justice).

# VI. JUDICIAL ESTOPPEL: DEFENDANTS CANNOT CLAIM RIGHTS WERE NOT "CLEARLY ESTABLISHED" AFTER ADMITTING THEM UNDER OATH

One of the most damning aspects of Defendants' qualified immunity defense is that it directly contradicts their own officers' sworn testimony. During depositions, the officers repeatedly

acknowledged that Plaintiff had constitutional rights and that they were aware of those rights. Now, in their motion for summary judgment, they claim that those same rights were not "clearly established." This is judicial estoppel, and it should bar their qualified immunity defense entirely.

**Officer Admissions Under Oath:**

- Officer Delancy admitted that Plaintiff had a right to record the police.

- Officer Delancy admitted that Plaintiff had a right to ask for badge numbers.

- Officer Delancy admitted that Plaintiff was cooperative and posed no threat.

- Officer Delancy admitted that the obstruction of justice charge was "incorrect."

- Officer Griffin admitted that Plaintiff committed "no crime past that point."

These admissions establish that the officers *knew* that Plaintiff's rights were clearly established at the time of the encounter. They cannot now claim ignorance of the law. As the Supreme Court has explained, "[t]he doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Here, Defendants have taken two irreconcilable positions: (1) in their depositions, they admitted that Plaintiff had clearly established rights; (2) in their motion for summary judgment, they claim those rights were not clearly established. They cannot have it both ways. Judicial estoppel bars them from asserting qualified immunity.

## VII. THE *HOPE v. PELZER* STANDARD: WHEN CONDUCT IS SO OBVIOUSLY UNLAWFUL THAT NO CASE-ON-POINT IS REQUIRED

Defendants attempt to distinguish *Hope v. Pelzer* by arguing that their conduct was not as egregious as handcuffing a prisoner to a hitching post for seven hours. This argument misses the point of *Hope* entirely.

The Supreme Court in *Hope* established that qualified immunity does not apply when the unlawfulness of the conduct is obvious, even in the absence of a case directly on point. 536

14

U.S. at 741. The Court explained that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. The question is not whether the conduct is as severe as the conduct in *Hope*; the question is whether a reasonable officer would have known that the conduct was unlawful.

Here, the answer is unequivocally yes. No reasonable officer would believe that he could:

- Arrest a cooperative, non-threatening citizen for asking for a badge number.

- Fabricate a charge of "obstruction" that he later admits was "incorrect."

- Invent a new justification for the arrest after the fact.

- Confiscate a citizen's phone to stop him from recording the encounter.

- Lie under oath about the facts of the encounter.

Each of these actions is a clear violation of established law. The right to be free from arrest without probable cause has been clearly established since *Beck v. Ohio*, 379 U.S. 89 (1964). The right to record the police has been clearly established in the Ninth Circuit since *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995). The prohibition on post-hoc justifications for arrests has been clearly established since *Devenpeck* itself. And the prohibition on perjury has been established since the founding of the Republic.

Defendants argue that *Hope* is inapplicable because Plaintiff was only handcuffed for "approximately seven minutes." (ECF No. 45 at 13). This argument is absurd. The duration of the violation does not determine whether the right was clearly established. A brief unlawful arrest is still an unlawful arrest. A brief act of perjury is still perjury. The Constitution does not tolerate violations simply because they are short-lived.

Moreover, Defendants' conduct here is, in many respects, more egregious than the conduct in *Hope*. The officers in *Hope* did not lie under oath about what they had done. They did not fabricate charges and then change their story when the fabrication was exposed. They did not engage in a systematic campaign of perjury to cover up their misconduct. Defendants here have done all of these things. If the conduct in *Hope* was "obviously" unlawful, then the conduct here is even more so.

15

## VIII. DEFENDANTS' "INHERENT AUTHORITY" THEORY IS A FABRICATION

Defendants argue that even if they lacked probable cause to arrest Plaintiff, they had "inherent authority" to order him back to his vehicle and to handcuff him when he refused. (ECF No. 45 at 4-5). This argument is a desperate attempt to manufacture a legal justification where none exists.

The cases Defendants cite—*United States v. Williams* and *United States v. In*—deal with the authority of officers to order passengers to remain in or return to a vehicle during a lawful traffic stop. But those cases do not authorize officers to handcuff a passenger simply because he exits the vehicle. Handcuffing is a seizure that must be justified by reasonable suspicion or probable cause. *See United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) ("Handcuffing a suspect is a significant restraint on his freedom of movement and is not part of a typical Terry stop.").

Here, Defendants had no reasonable suspicion that Plaintiff posed a threat or was about to flee. To the contrary, their own testimony establishes that Plaintiff was cooperative, posed no threat, and made no attempt to resist. The decision to handcuff him was not a response to any legitimate law enforcement concern. It was retaliation for his request for badge numbers.

Moreover, the "inherent authority" theory is itself a post-hoc rationalization. At no point during the encounter did the officers articulate that they were handcuffing Plaintiff because he had walked away from his vehicle. The stated reason was "obstruction of justice"—a charge they now admit was false. The "inherent authority" theory, like the VIN theory, was invented after the fact to justify an unlawful arrest.

## IX. MONELL LIABILITY: CHIEF HOLSTE'S DELIBERATE INDIFFERENCE AND THE CITY'S CUSTOM OF TOLERATING CONSTITUTIONAL VIOLATIONS

Defendants argue that Plaintiff has failed to establish Monell liability under any theory. This argument ignores the substantial evidence of Chief Holste's deliberate indifference to the officers'

misconduct and the City's unofficial custom of tolerating—and even encouraging—retaliation against citizens who exercise their constitutional rights.

## A. Official Policy of Deliberate Indifference

Plaintiff has identified a specific policy: the City's policy of failing to discipline officers who violate citizens' constitutional rights, even when those violations are documented and admitted. Chief Holste, as the final policymaker for the Hood River Police Department, was made aware of the officers' misconduct in this case. He reviewed the body camera footage. He read the officers' reports. He was aware that Sergeant Delancy had admitted that the obstruction charge was "incorrect." Yet he took no disciplinary action. He did not investigate. He did not reprimand. He did nothing.

This deliberate indifference constitutes an official policy under *Monell*. As the Ninth Circuit has explained, "[a] single decision by a municipal policymaker may, under certain circumstances, constitute a policy for which a municipality may be liable." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). Here, Chief Holste's decision to take no action in the face of clear evidence of constitutional violations is a policy decision that caused Plaintiff's injury. It sent a message to the officers that they could violate citizens' rights with impunity. And it created a culture in which perjury and fabrication are tolerated, if not encouraged.

## B. Unofficial Custom or Practice

Defendants argue that Plaintiff has provided "no evidence that Defendants' alleged conduct was more than a single incident." (ECF No. 45 at 8). This is false. Plaintiff has provided evidence of a pattern and practice of retaliation against citizens who exercise their First Amendment rights. The officers' own testimony reveals that they view requests for badge numbers as a form of insubordination that must be punished. The speed with which they moved from Plaintiff's request to his arrest—15 seconds—demonstrates that this was not an isolated incident, but rather a reflexive response born of custom and practice.

Moreover, the systematic perjury in this case—the fabrication of the VIN theory, the false claims about the phone recording, the contradictory statements about Plaintiff's cooperation—suggests

a department-wide culture in which officers feel comfortable lying to cover up their misconduct. This is not the conduct of rogue officers acting in isolation. This is the conduct of officers who have been trained, implicitly or explicitly, that constitutional violations will be tolerated and that lies will be accepted.

### C. Failure to Train

Defendants mischaracterize Plaintiff's failure-to-train argument as an attempt to impose respondeat superior liability. This is incorrect. Plaintiff is not arguing that the City should be held liable simply because its employees violated his rights. He is arguing that the City failed to adequately train its officers on clearly established constitutional principles, and that this failure amounts to deliberate indifference.

The evidence supports this claim. The officers in this case demonstrated a fundamental ignorance of basic constitutional law. They believed they could arrest someone for asking for a badge number. They believed they could fabricate charges and change their justifications after the fact. They believed they could confiscate a phone to stop a citizen from recording. These are not close calls. These are clear violations of well-established law. The fact that the officers did not know this suggests a systemic failure in training.

Under *City of Canton v. Harris*, 489 U.S. 378 (1989), a municipality can be held liable for failure to train when the failure amounts to "deliberate indifference" to the rights of persons with whom the police come into contact. Here, the City's failure to train its officers on the First Amendment right to record, the Fourth Amendment prohibition on arrest without probable cause, and the ethical obligation to tell the truth amounts to deliberate indifference. Chief Holste, as the final policymaker, was aware of these deficiencies and chose to do nothing. That is Monell liability.

## X. THE FOURTEENTH AMENDMENT CLAIMS: CONDUCT THAT SHOCKS THE CONSCIENCE

Defendants argue that Plaintiff's Fourteenth Amendment claims fail because the conduct alleged does not "shock the conscience." This argument fundamentally misunderstands the nature

of Plaintiff's claims and the evidence supporting them.

## A. Substantive Due Process: Systematic Perjury and Fabrication of Evidence

The "shocks the conscience" standard is met when government officials engage in conduct that is "intended to injure in some way unjustifiable by any government interest." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). Here, Defendants engaged in a systematic campaign of perjury and fabrication designed to cover up their unlawful arrest of Plaintiff. They lied about the basis for the arrest. They lied about the phone confiscation. They lied about Plaintiff's cooperation. And they did so knowingly, willfully, and with the intent to deprive Plaintiff of his constitutional rights.

This conduct shocks the conscience. It is not a mere technical violation of procedure. It is a deliberate, coordinated effort to pervert the judicial process and to deny Plaintiff his day in court. It is the kind of conduct that, if tolerated, would undermine the very foundations of the rule of law.

Defendants argue that Plaintiff has provided "absolutely no evidence" that their actions were a "deliberate attempt to harm him." (ECF No. 45 at 11). This is absurd. The evidence is overwhelming. Sergeant Delancy admitted under oath that the obstruction charge was "incorrect." He then fabricated the VIN theory to justify the arrest. He lied about the phone confiscation. He contradicted his own earlier statements. This is not negligence. This is not a mistake. This is deliberate, intentional misconduct.

## B. Procedural Due Process: Deprivation Without Process

Defendants argue that Plaintiff has provided "no legal authority whatsoever" for the proposition that officers must provide a hearing before detaining someone. (ECF No. 45 at 11). This argument is a straw man. Plaintiff is not arguing that officers must hold a formal hearing in the field. He is arguing that he was deprived of liberty without any process at all—no probable cause, no reasonable suspicion, no legitimate law enforcement justification. He was arrested for exercising his First Amendment rights, and he was given no opportunity to challenge that arrest until long after the damage was done.

The Due Process Clause requires that deprivations of liberty be supported by some legitimate basis. *See Daniels v. Williams*, 474 U.S. 327, 331 (1986). Here, there was no legitimate basis. The arrest was retaliatory, the justifications were fabricated, and the process was a sham. That is a violation of procedural due process.

### C. Equal Protection: "Class of One" Selective Enforcement

Defendants argue that Plaintiff has failed to identify an actual comparator who was treated differently. This argument misunderstands the "class of one" theory of equal protection. Under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a plaintiff can establish an equal protection violation by showing that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."

Here, Plaintiff has been treated differently from every other citizen who exercises his First Amendment right to record the police and ask for badge numbers. The vast majority of such citizens are not arrested, handcuffed, and subjected to fabricated criminal charges. Plaintiff was. The reason for this differential treatment is obvious: the officers retaliated against him for exercising his rights. That is not a rational basis. It is an unconstitutional basis.

Defendants cite *Whiting v. Cal. C.R. Dep't* for the proposition that a class-of-one claim cannot be based on a "hypothetical comparator." But Plaintiff's comparators are not hypothetical. They are the thousands of citizens who, every day, record the police and ask for badge numbers without being arrested. The fact that Plaintiff cannot name each of them individually does not defeat his claim. The differential treatment is evident from the record.

# XI. THE NOTWITHSTANDING CLAUSE: QUALIFIED IMMUNITY IS UNCONSTITUTIONAL

Finally, and most fundamentally, this Court should reject Defendants' qualified immunity defense because the doctrine itself is unconstitutional. As Professor Alexander Reinert has meticulously documented, and as Judge Carlton Reeves has powerfully articulated, the modern doctrine of qualified immunity is built on a historical falsehood.

The Civil Rights Act of 1871, as originally enacted by Congress, contained a critical provision known as the "Notwithstanding Clause." That clause provided that a person who violates another's civil rights "shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,** be liable to the party injured." *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 228-29 (2023).

This clause was a clear and unambiguous command from the Reconstruction Congress: state common law defenses, including the good-faith immunities that form the basis of modern qualified immunity, were **not** to be a defense to a § 1983 claim. The very purpose of the Ku Klux Klan Act was to override state laws and customs that were being used to shield those who violated the rights of newly freed slaves and their allies.

For reasons that remain unclear, this clause was omitted when the statute was codified in the Revised Statutes of 1874. For 150 years, courts have been applying a corrupted version of the statute—a version that directly contradicts the intent of Congress. The Supreme Court has built an entire body of qualified immunity jurisprudence on this corrupted text, creating a doctrine that is not merely atextual, but brazenly **counter-textual**.

As Judge Willett of the Fifth Circuit has recognized, this discovery is a "game-changing argument" that reveals modern immunity jurisprudence to be fundamentally illegitimate. *Rogers v. Jarrett*, 63 F.4th 971, 980-81 (5th Cir. 2023) (Willett, J., concurring). And as Judge Reeves explained in *Green v. Thomas*, the doctrine of qualified immunity is "an unconstitutional error" that has "no basis in law." No. 3:23-CV-126-CWR-ASH (S.D. Miss. May 20, 2024).

This Court is not bound to perpetuate this error. It has the authority—and the duty—to apply the law as Congress actually wrote it, not as it was later corrupted by a clerk's omission. The Notwithstanding Clause makes clear that Defendants are not entitled to any immunity, qualified or otherwise. They violated Plaintiff's clearly established constitutional rights, and they must be held accountable.

# CONCLUSION

This case presents a stark choice. This Court can accept Defendants' fabrications, reward their perjury, and grant them immunity for conduct they admit was unlawful. Or it can hold them accountable for their actions, vindicate Plaintiff's constitutional rights, and send a message that the rule of law still means something.

The evidence is overwhelming. The officers arrested Plaintiff for exercising his First Amendment rights. They fabricated justifications for the arrest. They lied under oath. They engaged in a systematic campaign to cover up their misconduct. And now they ask this Court to shield them from liability because, they claim, the law was not "clearly established."

This argument is an insult to the Constitution, to this Court, and to every citizen who believes that government officials should be held to the same standard as everyone else. The rights violated here were not obscure or novel. They are the bedrock principles of a free society. No reasonable officer could have believed that his conduct was lawful. And no court should grant immunity for conduct that shocks the conscience and offends every principle of justice.

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. DENY Defendants' Motion for Summary Judgment in its entirety on all claims, including:

   • Fourth Amendment unlawful arrest

   • Fourth Amendment excessive force

   • First Amendment retaliation

   • Fourth Amendment kidnapping/unlawful imprisonment

   • Fourteenth Amendment substantive due process

   • Fourteenth Amendment procedural due process

   • Fourteenth Amendment equal protection

   • Monell municipal liability

2. SCHEDULE this matter for JURY TRIAL to determine:

- Liability on all claims

- Compensatory damages for physical, emotional, and reputational harm

- Punitive damages to deter future misconduct

- Declaratory relief establishing Plaintiff's constitutional rights

- Injunctive relief requiring policy changes and officer training

3. REFER this matter to the United States Attorney for the District of Oregon for criminal prosecution under:

- 18 U.S.C. § 242 (deprivation of rights under color of law)

- 18 U.S.C. § 1621 (perjury)

- 18 U.S.C. § 1503 (obstruction of justice)

- 18 U.S.C. § 371 (conspiracy to violate civil rights)

- 18 U.S.C. § 241 (conspiracy against rights)

- 18 U.S.C. § 1201 (kidnapping)

4. PRESERVE all claims for jury determination, including all requests for compensatory damages, punitive damages, declaratory relief, and injunctive relief.

This is not a case for qualified immunity. This is a case for accountability. This is a case for justice. And this is a case that must be decided by a jury of Plaintiff's peers.

Respectfully submitted,


/s/ Cameron James Wilson

Pro Se Plaintiff

1312 South 44th Avenue

Yakima, Washington 98908

503-496-9239

cam@piitp.com

**CERTIFICATE OF SERVICE**

 I hereby certify that on December 3, 2025, I served a true and correct copy of the foregoing PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT upon all parties of record by the method(s) indicated below:

  Electronic filing via CM/ECF system

**Counsel for Defendants:**

Kenneth S. Montoya, OSB No. 064467

Keegan C. Murphy

Montoya Law

350 Mission St. SE, Suite 202

Salem, OR 97302

Email: kenny@montoyalaw.org; keegan@montoyalaw.org


/s/ Cameron James Wilson

Pro Se Plaintiff

# EXHIBIT A

## The Ku Klux Klan Act of 1871

## Civil Rights Act of April 20, 1871

(Original Text with Notwithstanding Clause)

---

This exhibit contains the original text of the Civil Rights Act of 1871, also known as the Ku Klux Klan Act, as enacted by the 42nd Congress. This statute, codified at 42 U.S.C. § 1983, forms the basis for Plaintiff's civil rights claims. Of critical importance is the "notwithstanding clause" contained in the original statute, which explicitly barred state common law defenses—including the good-faith immunities that form the foundation of modern qualified immunity doctrine. This clause was omitted when the statute was codified in the Revised Statutes of 1874, creating a textual corruption that has misled courts for 150 years.

# EXHIBIT B

## Qualified Immunity's Flawed Foundation

Alexander A. Reinert

Benjamin N. Cardozo School of Law

111 California Law Review 201 (2023)

---

This exhibit contains Professor Alexander A. Reinert's groundbreaking law review article documenting the historical discovery that the modern doctrine of qualified immunity is built on a corrupted statutory text. Professor Reinert's meticulous research revealed that the original 1871 Civil Rights Act contained a "notwithstanding clause" that explicitly prohibited the application of state common law defenses to civil rights claims. This clause was omitted—without congressional authorization—when the statute was codified in 1874. The Supreme Court has spent 150 years building qualified immunity jurisprudence on this corrupted text, creating a doctrine that is not merely atextual, but brazenly counter-textual to Congress's original intent. This article has been cited by federal judges, including the Honorable Carlton W. Reeves and the Honorable Don R. Willett, as evidence that qualified immunity lacks any legitimate legal foundation and should be rejected as an "unconstitutional error."